UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| *In re* STANWICH FINANCIAL SERVICES CORPORATION,<br>    *Debtor*.<br><br>THE LIQUIDATING AGENT OF STANWICH FINANCIAL SERVICES CORPORATION on behalf of THE LIQUIDATING ESTATE OF STANWICH FINANCIAL SERVICES CORPORATION AND ITS CREDITORS,<br>    *Plaintiff*,<br><br>v.<br><br>BEAR STEARNS & CO., INC. and HINCKLEY, ALLEN & SNYDER, LLP,<br>    *Defendants*. | No. 3:16-cv-01176 (JAM) |

**RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

    Twenty years ago a structured settlement company then known as Settlement Services Treasury Assignments, Inc. ("SSTAI") was sold to a man named Charles Bradley. SSTAI declared bankruptcy four years later. Plaintiff as the liquidating agent commenced this adversary proceeding, claiming in relevant part that the sale of SSTAI had in fact been a leveraged buyout and that it had violated Rhode Island's fraudulent transfer laws.

    The focus of this ruling is plaintiff's effort to recover against SSTAI's law firm, defendant Hinckley, Allen & Snyder, LLP ("Hinckley Allen"), for certain legal fees paid to Hinckley Allen as well as for $3.5 million that passed through Hinckley Allen's escrow account as part of the sale. Both parties now seek summary judgment on all or most of these claims, and plaintiff has additionally moved to exclude the testimony of Hinckley Allen's expert witness, Maryellen Seybold. Because I conclude that Hinckley Allen was a mere conduit for the escrow

1

payment, and that plaintiff's claims as to the legal fees are either time-barred or cannot be substantiated, I will grant Hinckley Allen's motion for summary judgment in full.

## BACKGROUND

SSTAI had a simple business model. When a victorious court plaintiff wished to receive the proceeds of a judgment over time rather than as one immediate payment, SSTAI would enter into a series of contracts between that plaintiff and the defendant in the case. The defendant would pay the judgment to SSTAI rather than to the plaintiff. SSTAI would then use this money to purchase Treasury bonds, and it would promise to pay the interest payments and redemption value of these bonds to the victorious plaintiff over time, as recurring payments and then as a final lump-sum. The face value of the bonds precisely matched SSTAI's obligations to the creditor-plaintiffs, and SSTAI promised never to sell these bonds, thus providing the creditor-plaintiffs with maximum security. Doc. #69 at 6–13 (¶¶ 13–37).

By the 1990s, however, economic conditions had caused the true market value of these bonds to rise above their face value. *Id*. at 21 (¶ 73). Jonathan Pardee, who had acquired a controlling interest in SSTAI in 1993, wanted to gain access to this excess value. *Id*. at 21 (¶ 74). To do this, he engaged in "reverse repo" transactions, wherein SSTAI sold the Treasury bonds to financial institutions for their full market value, in exchange for an obligation to repurchase the bonds for the same price later on. *See id*. at 30–32 (¶¶ 115–27) The proceeds of these "reverse repo" transactions were then invested in more Treasury bonds, with face values equal to the market value of the old bonds.

Plaintiff sees this maneuver as a sinister plot by Pardee to extract value from SSTAI in violation of the promises it had made and the fiduciary duties it owed to its creditor-plaintiffs. Doc. #68 at 21–32. Hinckley Allen, on the other hand, argues that Pardee was engaged in reasonable business transactions that did not affect the creditors' rights. Doc. #76 at 8–9.

Regardless, Pardee eventually decided to sell the company, and by 1997 he found a buyer: Charles Bradley, the chairman of a firm called Stanwich Partners, Inc. Doc. #69 at 37 (¶¶ 152–53). Pardee, along with the other shareholders of SSTAI, sold the company to Bradley on May 20, 1997, and the complex web of transactions that comprised that sale are at the heart of this case. *See id*. at 41–47 (¶¶ 176–205).

First, Bradley established a shell corporation called SST Acquisition Corp. ("SSTAC"). On May 20, 1997, SSTAI commenced a reverse repo transaction with Morgan Stanley, sending about $16.6 million in face value of Treasury bonds to Morgan Stanley in exchange for $19.4 million in cash (and a $19.4 million obligation to repurchase). Most of this $19.4 million was then loaned to three entities controlled by Bradley, including Consumer Portfolio Services, Inc. ("CPS"), which was Bradley's main subprime auto lending company. CPS received $14.5 million; the two other entities received $1.5 million and $833,400, respectively. CPS used its $14.5 million to purchase preferred stock of SSTAC, thus seeding the shell corporation with money, and SSTAC used $13.333 million of that money to purchase the SSTAI shares of Pardee and the other shareholders.

The remaining $1.167 million in SSTAC, along with the $2.333 million initially transferred to Bradley's two other entities, was deposited in an escrow account managed by Hinckley Allen. This was done in order to prompt Pardee to cause a company he owned, Bellevue Capital Ventures ("Bellevue"), to repay a $3.5 million loan from SSTAI. Indeed, on May 21, Bellevue did repay this loan to SSTAI, and pursuant to the terms of the escrow agreement Hinckley Allen transferred the $3.5 million to Pardee. There is some evidence in the record suggesting that the $14.5 million loan to CPS was repaid by August 5, 1997. Doc. #77-4 at 2.

Hinckley Allen also received $14,249.20 in legal fees from SSTAI from September 1996 through March 1997, prior to the sale. Doc. #66 at 6 (¶ 26). Subsequent to the sale, Hinckley Allen billed the selling shareholders of SSTAI for a total of $75,000 in legal fees. This was divided between a $49,140 invoice to Pardee, a $15,802.50 invoice to the Jonathan H. Pardee Charitable Remainder Trust ("CRUT"), and a $10,057.50 invoice to the Dunbar Wheeler Trust, which was associated with Ogden Sutro, the other selling shareholder beside Pardee. *Id*. at 7 (¶ 29).[1] The invoice to the Dunbar Wheeler Trust was paid on August 7, 1997, and the invoices to Pardee and to CRUT were paid on August 20, 1997. *Id*. at 8–9 (¶ 31).

SSTAI filed for bankruptcy on June 25, 2001, and this adversary proceeding was commenced on May 3, 2002. *See In re Stanwich Financial Services Corp.*, No. 5:01-bk-50831 (Bankr. D. Conn.). Plaintiff seeks to recover as fraudulent transfers the $3.5 million that passed through the Hinckley Allen escrow account in May 1997 and the $89,249.20 in total legal fees Hinckley Allen received from SSTAI and its selling shareholders. *See* Doc. #623 to No. 5:02-ap-05023 (Bankr. D. Conn.).

After protracted litigation in the Bankruptcy Court, plaintiff filed a motion to withdraw reference, *i.e.*, to transfer the case to the District Court, on May 12, 2015. Judge Underhill granted the motion on July 12, 2016 in light of the Supreme Court's decision in *Stern v. Marshall*, 564 U.S. 462 (2011). *See* Doc. #1, #12. Hinckley Allen now moves for summary judgment as to all of plaintiff's claims against it (Doc. #65), while plaintiff has moved for summary judgment solely as to its claims concerning the $3.5 million escrow payment (Doc.

---

[1] Hinckley Allen's Local Rule 56(a)(1) statement lists the invoice to CRUT at $10,082.50, while the trustee's Local Rule 56(a)(2) statement contends that this invoice was for $10,802.50. Because both parties agree that the total post-sale billing was for $75,000, and plaintiff's proffered amount for the CRUT invoice is the one that results in this total figure, the Court will use that figure.

4

#67). Plaintiff has also moved to exclude the testimony of defendant's expert witness, Maryellen K. Sebold. (Doc. #70).

**DISCUSSION**

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*); *Pollard v. New York Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017).

Plaintiff brings this action pursuant to 11 U.S.C. § 550(a), which provides that a bankruptcy trustee who has avoided a transaction made by the debtor pursuant to one of several other provisions of the Bankruptcy Code may "recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee." This provision allowing for recovery against subsequent, as opposed to initial, transferees may not be used to recover against "a transferee that takes for value . . . in good faith, and without knowledge of the voidability of the transfer avoided," or a subsequent good faith transferee thereof. 11 U.S.C. § 550(b)(1).

The substantive provision of the Bankruptcy Code that plaintiff has invoked to avoid the transfers at issue here is § 544(b)(1), which states in relevant part that "the trustee may avoid any

5

transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim." This reference to "applicable law" will frequently refer to state law, *see In re Palermo*, 739 F.3d 99, 101–02 (2d Cir. 2014), and plaintiff here has invoked two provisions of the Rhode Island Uniform Fraudulent Transfers Act (RIUFTA) to support avoiding these transactions, R.I. Gen. Laws §§ 6-16-4 and 6-16-5.

The first provision of Rhode Island law states that "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

    (i) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

    (ii) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due."

R.I. Gen. Laws § 6-16-4(a).

The second provision of Rhode Island law states in relevant part that "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of

6

the transfer or obligation." R.I. Gen. Laws § 6-16-5(a). The RIUFTA also states that any such fraudulent transfers under § 6-16-4 or § 6-16-5 may be avoided to the extent necessary to satisfy a creditor's claim. *See* R.I. Gen. Laws. § 6-16-7(a)(1).

What does all this mean? The short of it is that if plaintiff can show that Hinckley Allen received a transfer that was fraudulent under the RIUFTA, then plaintiff can avoid that transfer under 11 U.S.C. § 544(b)(1), and can potentially recover the amount of that transfer from Hinckley Allen under 11 U.S.C. § 550(a).

### *Whether Claims are Time-Barred*

As an initial matter, Hinckley Allen argues that plaintiff's claims are time-barred. Claims brought in bankruptcy proceedings are governed by two separate time limits. First, the claim must be brought within the time limits of 11 U.S.C. 546(a); the relevant rule for purposes of § 546(a) is that the claim must be brought within two years of the "order for relief." Here, the order for relief was entered on the day the bankruptcy petition was filed, on June 25, 2001, and the adversary proceeding—which has now morphed into the case before me—was filed on May 3, 2002, and was hence timely under § 546(a). *See* Doc. #68 at 65, Doc. #69 at 51 (¶¶ 229–30), Doc. #77 at 94 (¶¶ 229–30).

Even so, in order for the claims to be timely, the relevant statutes of limitations on the underlying substantive state law claims must not have expired before the filing of the bankruptcy petition. *See Collier on Bankruptcy* ¶ 546.02 [1][b] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010) ("If the state law limitations period governing a fraudulent transfer action has not expired at the commencement of a bankruptcy case, the trustee may bring the action pursuant to section 544(b), provided that it is commenced within the section 546(a) limitations period."); *see also In re Bernard L. Madoff Inv. Securities LLC*, 445 B.R. 206, 231 (S.D.N.Y. 2011) (collecting cases).

7

R.I. Gen. Laws. § 6-16-9 provides the statutes of limitations for claims brought under the relevant provisions of Rhode Island law. Making a clear distinction between claims for actual fraud and claims for constructive fraud, it provides that "a cause of action with respect to a fraudulent transfer or obligation under this chapter is extinguished unless action is brought:

> (1) Under § 6-16-4(a)(1) [actual fraud] within four (4) years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant;
>
> (2) Under §§ 6-16-4(a)(2) [constructive fraud] or 6-16-5(a), within four (4) years after the transfer was made or the obligation was incurred . . ."

*Ibid*. The bankruptcy petition was filed on June 25, 2001, meaning that any claims for events before June 25, 1997, are "extinguished" unless the time is lengthened by the discovery provision of § 6-16-9(1) or some similar tolling provision.

Contrary to plaintiff's suggestion, the time limit for a constructive fraud claim under § 6-16-9(2) is not susceptible to any sort of equitable tolling. Section 6-16-9(2) conspicuously lacks the one-year discovery rule found in § 6-16-9(1). Other courts have held that this means, implicitly, that the four-year limit in § 6-16-9(2) is not subject to tolling. *See, e.g.*, *Rohm and Haas Co. v. Capuano*, 301 F. Supp. 2d 156, 162–63 (D.R.I. 2004). I agree. Moreover, a number of courts have noted that § 6-16-9, and other analogous provisions of the UFTA in other states, is styled as a statute of repose (the word "extinguished" is key here), such that tolling should not apply. *See, e.g.*, *U.S. v. Bacon*, 82 F.3d 822, 823–24 (9th Cir. 1996).[2]

---

[2] The trustee relies on an earlier decision of the Bankruptcy Court in this case, seemingly holding that the trustee's allegations, if proven, would be enough to establish fraudulent concealment and thereby extend the time limits. *See* Doc. #68 at 66; *In re Stanwich Financial Services Corp.*, 317 B.R. 224, 231 (D. Conn. 2004). I am not bound by that decision, and in any event, the Bankruptcy Court's consideration of timeliness issues does not seem to have distinguished between the actual and constructive fraud claims. I read its holding as limited to the proposition that *some* claims might be timely, if plaintiff could show fraudulent concealment at trial.

Accordingly, all of plaintiff's claims for constructive fraud for events prior to June 25, 1997, are time-barred under R.I. Gen. Laws § 6-16-9(2). Claims for actual fraud for such events may not be time-barred if plaintiff can show fraudulent concealment as required by § 6-16-9(1).

### *Hinckley Allen Was Not a Transferee of the $3.5 Million Escrow Payment*

Both parties have moved for summary judgment as to the $3.5 million that passed through Hinckley Allen's escrow account on May 20–21, 1997. Hinckley Allen argues that it cannot be liable under 11 U.S.C. § 550 for this $3.5 million because an escrow agent is not a "transferee" for the purposes of § 550(a). I agree. In *Christy v. Alexander & Alexander of N.Y. Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*, 130 F.3d 52 (2d Cir.1997) (hereinafter "*Finley Kumble*"), the Second Circuit held that "the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes." *Id*. at 57 (quoting *Bonded Financial Servs. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988)).

This is known as the "dominion and control test." In adopting this test, the Second Circuit rejected an approach used in several other circuits, prominently including the Eleventh Circuit, under which a court treats the "first pair of hands to touch the property [as] the initial transferee," and then use "equitable powers to excuse innocent and casual 'initial transferees' from responsibility under § 550(a)." *Id*. at 56.

*Finley Kumble* also makes clear that, at least as a general rule, escrow agents do not have dominion or control over the funds deposited in their escrow accounts. The court noted, disapprovingly, that under the Eleventh Circuit's approach, "every courier, every bank and every *escrow agent* may be subjected to a great and unimagined liability that is mitigated only by powers of equity." *Id*. at 56 (emphasis added). One of the cases it cited, approvingly, as recognizing a distinction between an initial recipient and an initial transferee specifically

9

concerned a "law firm acting as escrow agent." *Id*. at 57 (citing *Gropper v. Unitrac, S.A. (In re Fabric Buys of Jericho, Inc.)*, 33 B. R. 334 (Bankr. S.D.N.Y. 1983)).

That is exactly the position of Hinckley Allen in this case: a law firm acting as an escrow agent. Cases since *Finley Kumble* have recognized that escrow agents are not initial transferees under § 550, but are rather "mere conduits." *See, e.g.*, *In re Trace Intern. Holdings, Inc.*, 287 B.R. 98, 106 (S.D.N.Y. 2002); *see also In re Ogden*, 314 F.3d 1190, 1202–05 (10th Cir. 2002).

Plaintiff advances two arguments why the mere conduit rule should not hold here. First, the trustee argues that Hinckley Allen knew that the web of transactions of which this escrow agreement was a part was fraudulent. Second, plaintiff argues that Hinckley Allen did have dominion and control over the escrow funds, because the escrow agreement, being part of the very scheme to defraud creditors, was void. Because "courts will generally refuse a transferor's request to enforce against a transferee any agreement or arrangement intended to defraud creditors, even if this permits the transferee to keep the transferred asset for its own use," Doc. #78 at 35, plaintiff suggests that Hinckley Allen was not truly bound by the restrictions of the escrow agreement but could well have put the $3.5 million to whatever use it pleased.

I don't agree. The second argument, concerning the void nature of the allegedly fraudulent transactions at issue here, proves entirely too much. Many if not most claims for recovery under § 550(a) involve allegations of fraud. Indeed, one of the avoidance sections of the Bankruptcy Code that may serve as the basis for recovery under § 550(a) is § 548, which allows the trustee to avoid transactions that are actually or constructively fraudulent. *See* 11 U.S.C. § 548(a)(1). The language of § 548 almost perfectly mirrors that of the RIUTFA provisions upon which plaintiff relies in this case. *Compare ibid*; R.I. Gen. Laws § 6-16-4(a). If plaintiff were correct, then the "mere conduit" defense would be unavailable in *any* § 550 action where § 548 furnishes the grounds for avoiding the transfer, because any contractual restrictions on the initial

10

recipient's use of the funds would have been voidable. This would be absurd enough even if *Finley Kumble* itself were not a § 548 case. *See* 130 F.3d at 53.

Plaintiff's initial argument—that Hinckley Allen cannot be a mere conduit because it knew the escrow agreement was part of a fraudulent web of transactions—likewise runs headlong into *Finley Kumble*, which expressly rejected treating good faith as relevant for transferee status under § 550(a). *See id*. at 56–58 (rejecting approach under which "the owner of the first pair of hands to touch the property is the initial transferee" and then using "equitable powers to excuse innocent and casual 'initial transferees' from responsibility . . . while holding liable those initial transferees who fail to act in good faith."). Under *Finley Kumble*, the question is not whether Hinckley Allen acted in good faith, but whether it had dominion and control over the money.

In arguing to the contrary, plaintiff chiefly relies on cases from the Eleventh Circuit, *e.g.*, *In re Harwell*, 628 F.3d 1312, 1322, 1323 (11th Cir. 2010) (interpreting the "mere conduct" test to mean that a court should engage in "a flexible, pragmatic, equitable approach of looking beyond the particular transfer in question to the circumstances of the transaction in its entirety" and "that good faith is a requirement under this Circuit's mere conduit or control test"). But *Harwell* reflects an approach the Second Circuit rejected in *Finley Kumble*.[3] *See State Farm Mutual Automobile Insurance Co. v. Grafman*, 2017 WL 4217122, at *4 n.3 (E.D.N.Y. 2017) (rejecting *Harwell* in light of *Finley Kumble*); *see also* Lori V. Vaughan, *Eleventh Circuit: Good Faith is Required for Mere-Conduit Defense to § 550(A)*, 30 Am. Bankr. Inst. J. 36, 36–37

---

[3] *In re Harwell* was decided fourteen years after *Finley Kumble*, and therefore is not mentioned in the Second Circuit's decision. But *Finley Kumble* did cite the Fourth Circuit's holding in *Huffman v. Commerce Sec. Corp. (In re Harbour)*, 845 F.2d 1254 (4th Cir. 1988), as an example of the approach it was rejecting. 130 F.3d at 56. By contrast, *Harwell* cites *Huffman* approvingly. 628 F.3d at 1323.

11

(2011) ("This holding [of *Harwell*] is contrary to the decisions from the Seventh Circuit in [*Bonded Financial*] and the Second Circuit in [*Finley Kumble*].").

Plaintiff next seizes on language from *Finley Kumble* itself which it sees as limiting the scope of the court's holding. The quoted language comes at the end of the decision, stating that "for present purposes, we need only hold that a commercial entity that, in the ordinary course of its business, acts as a mere conduit for funds and performs that role consistent with its contractual undertaking in respect of the challenged transaction, is not an initial transferee within the meaning of § 550(a)(1)." 130 F.3d at 59. Plaintiff takes this to mean that an entity acting *outside* the ordinary course of its business might qualify as a culpable initial transferee under § 550(a)(1) even if it lacked dominion or control over the funds in question.

But this takes the quote out of context. The immediate preceding paragraph is devoted to the question of whether a conduit might qualify as the initial transferee solely as to the amount of any *commission* taken from the entire corpus of funds passing as an escrow agent through its hands. Because no such commission had been taken in that case, the court did not ultimately decide the question, and thus had no occasion to clarify whether its holding is limited solely to those funds that do in fact pass through the conduit to another party.

This reading of *Finley Kumble* is particularly clear because plaintiff's proposed exception to the dominion and control test would swallow the entire rule. After all, how can one say that "the ordinary course of business" *ever* involves acting in bad faith? Moreover, *Finley Kumble* itself involved allegations of rampant malpractice, negligence, breach of contract, and breach of fiduciary duty by a law firm. 130 F.3d at 53. Yet it was this species of bad faith allegations that the Second Circuit held irrelevant to the § 550 inquiry. *Id*. at 58.

Plaintiff's argument also misunderstands the structure of the statute. Section 550(b)(1) states that the trustee may not recover from any subsequent (as opposed to initial) transferee who

"takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided." The category of subsequent transferees defined by § 550(a)(2), therefore, necessarily includes both good-faith and bad-faith transferees; § 550(b)(1) clarifies that recovery may not be had against good-faith subsequent transferees, but they are still subsequent transferees. And § 550(b)(1) *only* applies to subsequent transferees. The consequence of this structure is that the trustee may recover from initial transferees whether or not they acted in good faith, and therefore that, exactly as *Finley Kumble* held, good faith is irrelevant to the determination of transferee status under § 550(a).

Plaintiff cannot show that Hinckley Allen had dominion and control over the $3.5 million that was transferred into the firm's escrow account on May 20, 1997. An escrow agent is not, as a general rule, a transferee under § 550(a), and plaintiff has not shown why the general rule should not hold true in this case. Plaintiff cannot recover against Hinckley Allen for the $3.5 million for which it acted as escrow agent.[4]

### *Plaintiff's Claims Regarding Pre-Sale Legal Fees Are Time-Barred*

Hinckley Allen has moved for summary judgment as to the legal fees paid to it prior to the sale of SSTAI on May 20, 1997. These legal fees, $14,249.20 in total, were paid by SSTAI to Hinckley Allen from September 1996 through March 1997. Because these payments occurred before June 25, 1997, any claim for constructive fraud under R.I. Gen. Laws § 6-16-4(a)(2) is time-barred by R.I. Gen. Laws § 6-16-9(2). Any claim for actual fraud under R.I. Gen. Laws § 6-16-4(a)(1), meanwhile, is time-barred by R.I. Gen. Laws § 6-16-9(1) unless plaintiff can show

---

[4] Because I conclude that Hinckley Allen was not a transferee of this $3.5 million, I need not consider Hinckley Allen's other arguments regarding the escrow payment, for instance that the funds did not come from the debtor or that the payment is covered by the "safe harbor" provision of 11 U.S.C. § 546(e). Nor need I consider plaintiff's argument that, if all of Hinckley Allen's defenses were to fail as a matter of law, there would be no material issue of fact as to whether the escrow payment was in fact fraudulent within the meaning of the RIUFTA, or address whether plaintiff has introduced sufficient evidence to raise at least a triable issue concerning whether its claims regarding the escrow payment are timely under R.I. Gen. Laws 6-16-9(1).

that the fees could not "reasonably have been discovered by the claimant" until July 25, 2000, or later. Plaintiff does not point to specific evidence showing that the payment of these legal fees could not have been discovered prior to July 2000, or showing that Hinckley Allen took any steps to conceal the payment of these fees.[5] Accordingly, I hold that all claims pertaining to these pre-sale legal fees are extinguished under R.I. Gen. Laws § 6-16-9.

*Post-Sale Legal Fees*

Hinckley Allen has also moved for summary judgment as to plaintiff's claims for $75,000 in legal fees paid to Hinckley Allen after the sale of SSTAI. These fees were paid in August 1997, within the four-year time limit. Accordingly, plaintiff's claims both for actual and constructive fraud are timely as to these post-sale fees.

What plaintiff cannot show, however, is that these August 1997 legal fees were paid by SSTAI, as required for recovery under the RIUFTA.[6] The money transfers paying these fees were not made directly by SSTAI, but rather by Pardee, by CRUT, and by the Dunbar/Wheeler Trust. Rather, plaintiff argues that these fees were paid using the proceeds of the sale of SSTAI, and that Hinckley Allen is therefore liable as a mediate transferee under 11 U.S.C. § 550(a)(2). Plaintiff claims that none of these entities had any other funds with which they could have paid Hinckley Allen, and further observes that these post-sale legal fees were apportioned among these three entities in the same proportion as the proceeds of the sale.

This is not enough to create a triable issue of fact. First, plaintiff's assertion that Pardee, CRUT, and the Dunbar/Wheeler Trust did not have any assets besides the proceeds of the sale of

---

[5] Plaintiff argues that the entire scheme of the alleged LBO was not disclosed to SSTAI's creditors until a December 2000 letter from Charles Bradley informing them of the loss of SSTAI's Treasury bonds. This, however, relates to the sale of SSTAI, and whether the creditors could reasonably have discovered the sale itself. It does not address when the creditors could reasonably have discovered the payment of these legal fees from before the sale. Plaintiff has adduced no evidence as to this specific question.

[6] "A transfer made or obligation incurred *by a debtor* is fraudulent . . ." R.I. Gen. Laws § 6-16-4(a) (emphasis added). *See also* R.I. Gen. Laws § 6-16-5(a) (same).

SSTAI relies entirely on speculation. The record contains no comprehensive documentation of the assets of Pardee, CRUT, or the Dunbar/Wheeler Trust in August 1997. There is evidence that the Dunbar/Wheeler Trust held SSTAI stock as of May 20, 1997, and that it exchanged that stock for $2,257,805.00 at the time of the sale, Doc. #69-4 at 331, but there is no other record evidence concerning what other assets the Trust may have had at any relevant times. Likewise, the record reflects that the CRUT was formed on May 17, 1997, that its initial trust corpus consisted of 120 shares of SSTAI stock, and that these shares were exchanged for $3,546,806.40 at the time of the sale, *id.* at 316, 325, 331, but there is nothing in the record that tells us whether this was still the sole trust corpus as of August 1997.

Finally, plaintiff insists that Pardee himself must have used the sale proceeds to pay Hinckley Allen, because his resources were depleted so he had to fund Bellevue's repayment of the outstanding $3.5 million loan from SSTAI. But plaintiff offers no support for this claim that the repayment of the $3.5 million loan had depleted Pardee's assets to the point that he had no means to pay $49,140 in legal fees without using the proceeds of the SSTAI sale. The record does not suffice to create a genuine issue of fact that Pardee, CRUT, or the Dunbar/Wheeler Trust lacked any assets other than the sale proceeds with which they could have paid Hinckley Allen in August 1997.

Nor does the fact that the legal fees were distributed among Pardee and the two trusts in proportion to their share of the sale proceeds suffice to create a triable inference that they were in fact paid out of those proceeds. The apportionment of these post-sale legal fees appears to have been made by Hinckley Allen, when it sent invoices to the three entities. *See* Doc. #66-1 at 105–07. And it is entirely sensible that a law firm would bill its clients in proportion to the benefit they derived from the firm's work. This apportionment also roughly tracked the relative ownership stakes of Pardee and Sutro. *See* Doc. #69-3 at 99. Hinckley Allen, in other words,

billed the selling shareholders of SSTAI in proportion to their interest in SSTAI and its sale proceeds. This is hardly strange or unusual enough to suggest, let alone establish, that Hinckley Allen was being paid using the sale proceeds themselves, or that these legal fees were a pretense for the selling shareholders to give Hinckley Allen a cut of the proceeds.

Ultimately, all plaintiff can show is that the post-sale legal fees were paid by people who also received transfers as part of the sale of SSTAI. This is not enough to show that those fees were actually paid *by the debtor*, as plaintiff must show to recover under Rhode Island law.

## CONCLUSION

For the foregoing reasons, defendant Hinckley Allen's motion for summary judgment (Doc. #65) is GRANTED in full, plaintiff's motion for summary judgment (Doc. #67) is DENIED, and plaintiff's motion to exclude expert testimony (Doc. #70) is DENIED as moot.

It is so ordered.

Dated at New Haven this 8th day of March 2018.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge